UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHANCELLOR SU and PEARLL CLEMENTE,**<br><br>   Plaintiffs,<br><br>   v.<br><br>**AT&T, INC., JOHN AND JANE DOES 1–10 (fictitious names), and ABC CORP. 1–10 (fictitious entities),**<br><br>   Defendants. | Civ. No. 19-15989 (KM) (JBC)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

   The plaintiffs, Chancellor Su and Pearll Clemente, worked for AT&T at its store in Fort Lee, New Jersey. In 2018, after it conducted a nationwide investigation into allegations of improper sales practices by its employees, AT&T fired Su and Clemente. Su and Clemente then sued AT&T, claiming that they had been wrongfully terminated. On January 8, 2020, this Court entered an amended opinion and order (DE 10 & 11) granting, pursuant to Fed. R. Civ. P. 12(b)(6), AT&T's motion to dismiss the complaint.

   The plaintiffs now seek to amend their complaint with more specific allegations and the identities of the store managers who they say instructed them to engage in improper sales behavior. Now before the Court is the plaintiffs' motion to amend or correct the complaint. (DE 12). Also before the Court is defendant AT&T's motion to dismiss the complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6). (DE 13). For the following reasons, the motion to amend the complaint is **GRANTED**, but the motion to dismiss the amended complaint for failure to state a claim is also **GRANTED**.

I. **BACKGROUND**[1]

Because I write for the parties, I assume familiarity with my prior Opinion and focus on the allegations newly added to the proposed first amended complaint ("1AC", DE 12-3). For reasons that are unclear, certain allegations are included, not in the proposed amended complaint, but in accompanying certifications of Chancellor Su (DE 12-4) and Pearll Clemente (DE 12-5).

   **A. Facts**

Plaintiffs allege in the proposed amended complaint that AT&T store managers Daniel Ferraro, Lissette Maldonado, and Andres Collins[2] oversaw them and insisted that they engage in sales practices that Plaintiffs believed—and that AT&T's investigation confirmed—were unethical. (1AC ¶ 11). After doing so, Plaintiffs received complaints from customers who had incurred charges for products and services that they did not want. (1AC ¶ 13). Plaintiffs then expressed to their managers concerns over these tactics. (1AC ¶ 13). Plaintiffs allege that the managers refused to investigate or remediate these problems and admonished Clemente for being the "bad apple in the group." (1AC ¶ 13). Despite Plaintiffs' expressed concerns, the managers told them to continue using the same sales tactics, particularly the use of fake email accounts. (1AC ¶ 13).

The pressure from AT&T to make sales increased. Plaintiffs were told to push DirectTV Now subscriptions by promising customers free accessories and

---

[1] For purposes of this motion, the facts alleged in the proposed amended complaint, not yet tested by any fact finder, are assumed to be true. Docket entries will be cited as "DE __". The proposed amended complaint (DE 12-3) will be cited as "1AC".

[2] The original complaint failed to identify any individual who allegedly suborned the misconduct.

service discounts.³ (1AC ¶ 14). Again, Plaintiffs told their managers that these tactics contravened acceptable business practices. (1AC ¶ 14).⁴

---

³    It is not clear whether Plaintiffs are challenging the propriety of incentivizing sales by offering free or lower-cost products and services. In fact, this sales tactic is a common and acceptable one. What is clear, however, is that other improper sales tactics specified in the complaint were allegedly deployed in pursuit of DirecTV Now subscriptions:

> Plaintiffs were advised by managerial and supervisory personnel to use many different tactics to increase DirecTV Now subscriptions, including, but not limited to, offering customers DirecTV Now subscriptions when they had received data overage charges, offering discounts on accessories in exchange for DirecTV Now subscriptions and even using as many as three (3) different false email address to create accounts for customers. Plaintiffs were later admonished for using accounts with fake emails or signing up customers without having valid email addresses, despite the instruction from the managerial and supervisory staff to do so.

(1AC ¶ 12).

⁴    Su, in an accompanying certification, elaborates on the generalized allegations in the complaint. He accuses AT&T of punishing its employees for honoring customers' requests to unsubscribe from services that they did not want:

> On many occasions, customers who ha[d] signed up for the service would complain that they no longer wanted the service and we were asked to cancel the subscriptions; however, if we cancelled subscriptions we were admonished by our Managers for not keeping the customer signed up for the service and were simply forced to use even worse sales tactics, over our objections. Despite this, the sales tactics, which often involved lying to customers, were forced to continue. I had approached Management on multiple occasions and requested some clarification as to why we were continuing to lie to customers or why we needed to sell subscriptions in this manner, and in fact told Management on multiple occasions that we should not be selling subscriptions the way that we were, but I was told that this was how things needed to be done and instructed to continue with these sales tactics, even though I did not feel comfortable lying to customers or using fake email addresses and using unethical sales tactics.
>
> [] In or about February 2018, we were finally provided with training which AT&T told us was the "right" way to sell; however, it was too little too late. Just a month following, myself and many of my co-workers, and what I understand it to be many across the nation, were the subject of an internal investigation. I was instructed to not tell the truth to the investigators and to not say that management had forced me to sell the subscriptions in the manner that I did. I now understand, and it is my sincere belief, that I and my co-

3

In March 2018, AT&T began a nationwide investigation into improper sales tactics. (1AC ¶ 15). After the investigation, AT&T admonished Su and Clemente for engaging in such tactics. (1AC ¶ 12). Su and Clemente protested that it was only at the instruction of Ferraro, Maldonado, and Collins that they had created accounts with fake emails and enrolled customers without valid email addresses. AT&T fired them nonetheless. (1AC ¶ 16).

### B. Procedural History

On January 8, 2020, this Court entered an amended opinion (DE 10) and order (DE 11), dismissing the complaint without prejudice to the submission, with thirty days, of a properly supported motion to amend.

---

workers were being used as scapegoats for Management which eventually led to my termination.

(DE 12-4 ¶¶ 4–5).

Clemente generally agrees with this factual characterization. (DE 12-5 ¶ 2). She also alleges that she was admonished for expressing discomfort with AT&T's sales practices and that, notwithstanding her participation in the misconduct, she believed that her job was safe because she was following her managers' instructions:

> During the time when we were forced to sell DirectTV Now subscriptions at all costs, I had approached a Manager, Andres Collins, and told him that the way we were being asked to sell subscriptions was not ethical and that I thought we should not be selling subscriptions in the manner that we were. I was told to not be the "bad apple" in the group and to continue selling subscriptions in the manner that I had voiced my objections to. Despite knowing that the sales tactics were unethical and despite Management knowing that I thought as much, I was told that this was what was expected of me.
>
> [] Even though I continued to use unethical sales tactics in the manner that Management knew I thought was wrong, I thought I was protected because I was simply following the instruction of my superiors. I came to learn that my feelings could not be further from the truth. When the investigation by AT&T started, similar to what Mr. Su was told, I was told to lie to investigators and to not tell investigators that it was Management that made me use the sales tactics in the manner that I did. Notwithstanding these circumstances, and despite telling investigators that I was not ever told to stop these sales tactics, I was terminated along with many of my co-workers.

(DE 12-5 ¶¶ 3–4).

On February 7, 2020, Plaintiffs moved to amend or correct the complaint and filed a proposed amended complaint. (DE 12-3). On February 18, 2020, AT&T filed a combined opposition to Plaintiffs' motion and cross-motion to dismiss the proposed amended complaint. (DE 13). On March 9, 2020, Plaintiffs filed a combined reply on their motion and opposition to the cross-motion. (DE 15)

## II. DISCUSSION

Because this matter involves a controversy between citizens of different states and the amount in controversy is alleged to exceed $75,000, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). New Jersey substantive law applies. *See generally Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

### A. Standard of Review

As noted, this matter is presented as both a motion to amend the complaint and a motion to dismiss the amended complaint. Either way, the familiar Rule 12(b)(6) standard applies.

#### 1. Motion to Amend

A party may amend its pleading once as a matter of course within

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under 12(b), (c), or (i), whichever is earlier.

Fed. R. Civ. P. 15(a). Accordingly, amendment of a complaint in response to a motion to dismiss is often permitted without leave of court. *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

After amending once or after an answer has been filed, however, leave of court or written consent of the opposing party is required. *Id.*; *see also* Fed. R. Civ. P. 15(a). Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Accordingly, courts "have shown a strong liberality . . . in allowing amendments under Rule 15(a)." *Heyl & Patterson Int'l, Inc. v.*

*F.D. Rich Hous.*, 663 F.2d 419, 425 (3d Cir.1981) (quoting 3 J. Moore, Moore's Federal Practice ¶ 15.08(2) (2d ed. 1989)).

In *Foman v. Davis*, 371 U.S. 178 (1962), the Supreme Court put its stamp on the liberal amendment policy, while identifying a number of factors relevant to a motion to amend under Rule 15(a):

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Id.* at 182.

Amendment may be denied, however, if it would be "futile." Futility is established if the complaint, as amended, "would not withstand a motion to dismiss." *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 125 (3d Cir. 1983); *see also Brown v. Philip Morris Inc.*, 250 F.3d 789, 796 (3d Cir. 2001); *Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984). The futility analysis, then, is commonly indistinguishable from the analysis under Rule 12(b)(6).

### 2. Rule 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trs. Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the

complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

### B. Wrongful Termination

Absent a contract, employment in New Jersey is an at-will relationship, generally terminable for any reason or for no reason. *See Pierce v. Ortho Pharmaceutical Corp.*, 417 A.2d 505, 508–09 (N.J. 1980). The discharge of an at-will employee may nevertheless be wrongful and actionable if, as Plaintiffs claim here, it violates a clear mandate of public policy. *Id.* at 512.

*Pierce* enlightens the issue of what constitutes a "clear" public-policy mandate. There, a physician employed by a pharmaceutical firm resigned under pressure after declining to participate in medical research involving an ingredient whose safety she regarded as "controversial." She then sued her former employer. *Id.* at 507–08. The tort of wrongful termination, the court wrote, was developed to fill a gap in the law by prohibiting the discharge of nominally at-will employees for reasons that violate public policy. *See id.* at 512 ("Employees will be secure in knowing that their jobs are safe if they exercise their rights in accordance with a clear mandate of public policy. On the other hand, employers will know that unless they act contrary to public policy, they may discharge employees at will for any reason."). Thus "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Id.* at 512. Public policy, the court held, generally derives from the decisions of governments. *Id.* at 514. The physicians'

7

Hippocratic oath, despite its venerable 2,000-year history, was held not to constitute such a clear mandate of public policy.[5]

*Pierce* and cases interpreting it have held that to identify the relevant public policy, courts are generally to look to "legislation; administrative rules, regulations or decisions; and judicial decisions." *Id.* at 512; *accord Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 149 (3d Cir. 2004);[6] *Myers v. Advanced Stores Co. Inc.*, No. 19-18183, 2020 WL 2744632 at *6 (D.N.J. May 27, 2020) (Wolfson, C.J.). In addition, "more is needed than simply the breach of public policy affecting a single person's rights to constitute the breach of a 'clear mandate' of public policy that *Pierce* requires." *Hennessey v. Coastal Eagle Point Oil Co.*, 129 N.J. 81, 99 (1992). Critically, a plaintiff must "prove not only that he or she complained about a[n employer's] policy, but that his or her resulting discharge violated a clear mandate of public policy." *Tartaglia v. UBS Paine Webber, Inc.*, 197 N.J. 81, 112 (2008); *see also Daniels v. High Point Bd. of Educ.*, No. A-1112-17T1, 2019 N.J. Super. Unpub. LEXIS 91 at *3 (App. Div. Jan. 11, 2019) ("Under *Pierce*, plaintiff bore the burden of 1) identifying a specific expression of public policy and[] 2) establishing he was fired in contravention of that specific expression of public policy.").

In my Opinion dismissing the original complaint, I noted that Plaintiffs were attempting to use the alleged malfeasance of AT&T's managers to shield their own wrongdoing, and were doing so in tautological fashion:

> Here, Plaintiffs' case rests on a rather generic understanding of *Pierce*, namely that it implements "a public policy . . . to not terminate employees under these circumstances." (DE 7 at 1). The Court presumes that "these circumstances" refers to the termination of an employee who follows a manager's instruction,

---

[5] The Court did not absolutely rule out reliance on professional standards that embody public policy, but noted that in the area of drug testing, the government has enacted its own regime of safety regulations.

[6] The holding of *Conoshenti* was later modified on grounds, not relevant here, involving the Family Medical Leave Act. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508–09 (3d Cir. 2009).

8

> even if corporate policy turns out to be contrary. (*See* DE 7 at 1). In short, Plaintiffs are attempting to shift the accountability for their own wrongdoing to AT&T.

(DE 9 at 5). I further noted that Plaintiffs had "neither (1) identified a specific expression of public policy that AT&T violated, nor (2) alleged that they expressed concern about the sales practices that their managers and supervisors ordered them to observe." (DE 9 at 5–6).

The proposed amended complaint satisfies the second requirement: it contains allegations that Plaintiffs contemporaneously expressed their concerns that those instructions were improper. (*See, e.g.*, 1AC ¶¶ 13–14). But Plaintiffs did, by their own admission, acquiesce and persist in those questionable sale practices. And they allege that it was for engaging in those practices, not for objecting to them, that they were fired.

Completely lacking, however, are allegations satisfying the first requirement, *i.e.,* specification of a "clear mandate of public policy," *Tartaglia*, 197 N.J. at 112, expressed in "legislation, administrative rules, regulations or decisions, and judicial decisions," *Pierce,* 417 A.2d at 512. To be clear, the inquiry is not whether AT&T ever violated any public policy—for example by allegedly fostering a culture of improper sales practices. Rather, to overcome a motion to dismiss, Plaintiffs must allege how *their termination* for engaging in such practices violated public policy. *See Conoshenti*, 364 F.3d at 149 ("The *Pierce* doctrine is about wrongful discharges, and it has only been applied where the discharge itself offended a clear public policy.").

The proposed amended complaint speaks solely in legal conclusions: Plaintiffs' termination, it says, "was in violation of an established rule of public policy as enumerated by the legislature, an administrative rule, regulation or decision, judicial decision and/or some other established rule of public policy and/or was otherwise in violation of public policy." (1AC ¶ 21). That is precisely the sort of conclusory allegation that does *not* meet the requirements of *Twombly* and *Iqbal, supra.* Nowhere in the two complaints, numerous motion papers, or supplemental filings have Plaintiffs identified the policy that was

9

violated by AT&T's firing of them. Their failure to specifically identify such a policy is fatal to their complaint:

> The public policy must also be "clearly identified and firmly grounded. . . . A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate." [quoting *MacDougall v. Weichert*, 144 N.J. 380, 677 A.2d 162, 167 (1996)]. "[U]nless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause." *Pierce*, 417 A.2d at 512.

*Conoshenti,* 364 F.3d at 149.

Any such policy, in this context, would have to be a public policy against firing employees who admittedly acted unethically, but were allegedly just following orders. Plaintiffs' failure to cure the deficiencies of the complaint is captured in a statement in Clemente's affidavit: "Even though I continued to use unethical sales tactics in the manner that Management knew I thought was wrong, I thought I was protected because I was simply following the instruction of my superiors."[7] (DE 12-5 ¶ 4). Su also admits knowing that his conduct was wrongful: "I did not feel comfortable lying to customers or using fake email addresses and using unethical sales tactics." (DE 12-4 ¶ 4). In other words, Plaintiffs knew that what they were doing was wrong, but labored under the false impression that their conduct would have no consequences. AT&T's enforcement or non-enforcement of its internal policies may have been unfair or inconsistent. But Plaintiffs are arguing that firing them for engaging in this unethical conduct violates *public* policy.

Public policy, if anything, points the other way. Plaintiffs' theory still rests on an attempt to shift accountability for their own wrongdoing to AT&T. Significantly, they are not alleging that they were fired for objecting to or

---

[7] Defendants analogize as follows: "Such a contention is no different than a thief's claim that he is protected from discharge because his boss told him to steal from their employer. There is no public policy, much less a clear mandate of such a policy, that would bar that thief's termination or require his continued employment. The same is obviously true of plaintiffs' termination." (DE 13-1 at 9–10).

10

refusing to engage in unethical behavior; to the contrary, they went right along. There is no public policy in favor of permitting such practices to go unaddressed. Perhaps implicit in Plaintiffs' theory is some notion of selective prosecution; others may, as they allege, deserve most of the blame. It so, the lesson may be that the firings didn't go far enough, not that they shouldn't have occurred at all.

To be clear, the complaint does not allege that Plaintiffs were fired in retaliation for voicing their discomfort with sales practices, or being "whistleblowers."[8] Nor do the factual allegations of the complaint suggest such a claim. In response to the dismissal of the original complaint, Plaintiffs now allege rather vaguely that they contemporaneously complained to their supervisors that the sales practices were unethical. They admittedly continued to engage in those practices, however, and suffered no repercussions. As they themselves allege, they were not fired in retaliation for whistleblowing; much later, when the sales practices were uncovered by a corporate investigation, they were fired for engaging in those unethical practices—perhaps unfairly, as they claim, but if they were at-will employees, they have no cause of action for that.

Su and Clemente were at-will employees and, absent a clear public policy to the contrary, AT&T was entitled to fire them with or without cause. In two attempts, supplemented by briefs and affidavits, Plaintiffs have failed to

---

8   *Tartaglia* helpfully compared the two as follows:

> In large measure, the statutory and common law causes of action are similar, and the statutory language overlaps the *Pierce* articulation of the basis for the common law remedy. *Compare* N.J. Stat. Ann. 34:19–3(c) (identifying basis for CEPA cause of action as employee's "reasonabl[e] belie[f]" that employer's act "is in violation of a law, or a rule or regulation promulgated pursuant to law [,] . . . is fraudulent or criminal[, or] . . . is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment") *with Pierce*, 84 N.J. at 72, 417 A.2d 505 (referring to the alleged violation of "a clear mandate of public policy").

961 A.2d at 1181.

identify any clear mandate of public policy against dismissal of employees whose admittedly unethical sales practices were committed at the behest of their supervisors. Accordingly, further amendment of the complaint would be futile, and the claims contained in the First Amended Complaint are dismissed with prejudice.

### III. CONCLUSION

For the reasons set forth above, Su and Clemente's motion to amend or correct the complaint (DE 12) is **GRANTED**, and AT&T's motion to dismiss (DE 13) is **GRANTED**. A separate order will issue.

Dated: July 10, 2020

/s/ Kevin McNulty
_____
**Hon. Kevin McNulty
United States District Judge**